IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


**GERALD RILEY,**                                    Case No. 3:17 CV 1595

     Plaintiff,

     v.                                          Magistrate Judge James R. Knepp II

**LIBERTY INSURANCE CORP.,**

     Defendant.                                   MEMORANDUM OPINION AND ORDER


### INTRODUCTION

Plaintiff Gerald Riley owned a single-family residence at 856 Nebraska Avenue in Toledo, Ohio, which Defendant Liberty Insurance Corporation insured. On November 18, 2016, the residence suffered severe fire damage. As a result, Plaintiff filed an insurance claim with Defendant, which it ultimately denied in May 2017. In his Complaint, Plaintiff alleged Defendant breached the insurance contract by failing to pay the amount due under the terms of the agreement. Defendant responded that it acted with reasonable justification in denying the claim on the basis that the residence did not qualify as a "residence premises" under the contract, and Plaintiff violated the "concealment or fraud" condition of coverage. The conflagration litigation reached a bench trial held February 20-22, 2019 (Docs. 109-11), followed by simultaneously-filed post-trial briefs (Docs. 112-13).

Following review, and for the reasons contained herein, the undersigned grants judgment in favor of Defendant.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

As noted above, Defendant gave two reasons for denying Plaintiff's insurance claim: (1) the property did not qualify as a "residence premises" under the contract; and (2) Plaintiff violated the "concealment or fraud" condition of coverage. Thus, the first issue for the Court to decide is twofold: (1) whether the terms of the insurance contract condition recovery upon Plaintiff residing at the insured premises; and (2) if so, whether the agreement required Plaintiff reside there at the time he entered into the contract or at the time of the loss or both. If the answer to the first question is "yes", the second issue is whether Plaintiff *actually* resided there during the relevant time period. Alternatively, the Court must determine whether Defendant properly denied coverage based on Plaintiff's "concealment or fraud". The undersigned addresses these issues in turn.

<u>Residency Requirements Under the Contract</u>

Plaintiff first argues the insurance contract does not clearly and unambiguously require him to reside at the property. (Doc. 112, at 6-13). Specifically, he contends the "residence premises" language exists only to identify the insured property, and it does not mean coverage is excluded if Plaintiff did not reside there. *Id*. at 9. To support his position, Plaintiff emphasizes that the contract contains certain coverage "exclusions" if the home is vacant, such as, e.g., broken water pipes. *Id*. at 11-12. Finally, Plaintiff asserts that – even if the contract requires residency – he resided at the insured premises on the date of the loss. *Id*. at 14-19. Defendant counters that the language within the contract is unambiguous, even under the most generous interpretation (Doc. 113, at 8-11), and the evidence shows Plaintiff did not reside at the property at the time he entered into the contract, nor on the date of loss, *id*. at 4-8.

The Ohio Supreme Court has explained that an insurance contract must be construed to give words their plain and ordinary meaning. *State Farm Auto. Ins. Co. v. Rose*, 575 N.E.2d 459,

461 (Ohio 1991), *rev'd on other grounds*, 620 N.E. 2d 809 (Ohio 1993). However, if the language is ambiguous, and thus susceptible to more than one interpretation, it must be liberally construed in favor of the insured. *Id*.; *see also Akins v. Harco Ins. Co*., 815 N.E.2d 686, 693 (Ohio Ct. App. 2004) ("[A]ny reasonable construction which results in coverage of the insured must be adopted by the trial court."), *rev'd on other grounds*, 830 N.E.2d 1161 (Ohio 2005). Importantly, "[u]nder Ohio law, the burden is on the insured to prove that he is entitled to coverage by showing facts sufficient to establish that his loss was within the description of the policy." *State Farm Fire & Cas. Co. v. Hiermer*, 720 F. Supp. 1310, 1314 (S.D. Ohio 1988) (citing *Sterling Merch. Co. v. Hartford Ins. Co*., 506 N.E.2d 1192, 1199 (Ohio Ct. App. 1986) ("The burden, however, is not on the insurer, but on the insured to prove that he is entitled to coverage."), *aff'd,* 884 F.2d 580 (6th Cir. 1989) (unpublished table decision)).

The Court finds the contract language at issue clear and unambiguous. The Declarations page identifies Plaintiff by name, notes his mailing address as "856 Nebraska Ave.", and identifies the *insured location* as: "[s]ame as [m]ailing address above". *See* Pl. Ex. 1, at 1 (insurance contract). Following the Declarations, the contract provides a "definitions" page, which states, in relevant part:

> 4. "Insured location" means:
>> a. The "residence premises";
>> b. The part of other premises, other structures and grounds *used by you as a residence* and:
>>> (1) Which is shown in the Declarations; \*\*\*
>
> 8. "Residence premises" means:
>> a. The one family *dwelling*, other structures, and grounds; or
>> b. That part of any other building;
>> *where you reside* <u>and</u> which is *shown as the "residence premises" in the Declarations*.

*Id.* at 5 (emphasis added). By definition here, the "residence premises" is the "insured location" shown in the Declarations – 856 Nebraska Avenue. *Id.* at 1. The contract then unambiguously defines the "residence premises" as a "dwelling. . . *where you reside . . . and* which is shown as the 'residence premises' in the Declarations." *Id.* at 5 (emphasis added). Finally, the contract identifies coverage:

> We cover:
> 1. *The dwelling on the "residence premises" shown in the Declarations*, including structures attached to the dwelling;
> \*\*\*

*Id.* (emphasis added).

In cross-referencing these definitions, it becomes clear the insurance contract covers the dwelling on the residence premises, and the contract defines such as a "dwelling . . . *where you reside*". *Id.* (emphasis added). In other words, only the residential dwelling is covered by the policy, and that can only be a place "*used by you as a residence*". *Id.* (emphasis added). And, as noted above, Ohio courts shall give insurance contract terms their plain and ordinary meaning unless another meaning is clearly apparent from the contents of the policy. *State Farm Auto. Ins. Co.*, 575 N.E.2d at 461. For this reason, Plaintiff's argument that "residence" is ambiguous because the contract includes specific coverage exclusions for vandalism, theft, and frozen pipes if the property is unoccupied, is unavailing. (Doc. 112, at 11-12) (citing Pl. Ex. 1, at 10-11). Although the term "residence" may be ambiguous in other contexts, there is no ambiguity where, as here, specific language clearly defines the term. Thus, the Court concludes the insurance contract language, as emphasized above, makes clear that recovery was conditioned upon Plaintiff *residing* at 856 Nebraska at the time of the loss.

<u>Plaintiff's Residency Status</u>

Because the insurance contract conditioned recovery upon Plaintiff residing at 856 Nebraska Avenue, the next relevant question becomes: did he really live there? Plaintiff contends that – even if the contract required residency – he resided at the insured premises on the date of the loss. (Doc. 112, at 14-19). In support, he relies on: (1) the testimony of eyewitnesses: his neighbors, Otis Williams and Dean Taylor; his father, William McCloud; and his former tenant, Ariane Stevens; and (2) the fact that utilities to the property were active at the time of the fire. *Id*. at 14-15. Defendant: (1) disputes Plaintiff's utility usage and the credibility of the witnesses; (2) argues their investigator, and Toledo Fire Department employees determined the home was vacant; and (3) notes that investigators were able to locate very few of the 3,582 items Plaintiff claimed were lost in the blaze. (Doc. 113, at 6-9, 15). The Court addresses the evidence of residency below.

*Plaintiff's Representations*

As Defendant emphasizes, Plaintiff affirmatively represented 1554 Avondale Avenue in Toledo, Ohio as his residence on numerous occasions. *See* Doc. 113, at 6. For example, on the date of the fire, Plaintiff's driver's license reflected the Avondale address. (Trial Tr. 193: 15-18). At the time of the fire, Plaintiff's bank account was also registered to the Avondale address. (Def. Ex. 79; Trial Tr. 193: 19-22). A resignation letter dated September 8, 2016 reflected the same (Trial Tr. 193: 23-25; 194: 1), as did an employer's request for information and a Federal Employment Eligibility Verification from Plaintiff dated November 10, 2016 (eight days before the fire). (Def. Exs. 7, 8; Trial Tr. 194: 6-16). Plaintiff also never changed his mailing address, and was still receiving mail at 1554 Avondale. (Def. Ex. 105, 22: 4-24) ("Smith Depo."). Finally, Plaintiff was on parole at the time of the fire and had the Avondale address registered with the State as his address of record. (Trial Tr. 141: 19-25; 142: 1-3). He testified that he did not tell his parole officer

of any move to 856 Nebraska Avenue because he was not required to, and "[i]t wasn't none of his business." (Trial Tr. 142: 4-6, 20). However, at her deposition, Plaintiff's mother testified he was "supposed to" report a change of address to his parole officer. (Smith Depo. 20: 13-24; 21: 1-2). Plaintiff does not address these inconsistencies in his post-trial brief. *See* Doc. 113.

*Fire Department Personnel Testimony*

Timothy Clapp, a Battalion Chief with the Toledo Fire Department, and 25-year firefighting veteran, took charge of the fire scene at 856 Nebraska. (Trial Tr. 587: 22-23; 588: 22-23, 25; 589: 1-9). Chief Clapp determined the structure was vacant. (Def. Ex. 61, at 1; Trial Tr. 596: 4-23). He specifically noted there were no "signs" of residency such as "furniture, appliances and stuff in the kitchen, and it just didn't look like it was habitable unless they're sleeping on the floors." (Trial Tr. 596: 14-17). Chief Clapp spoke with a neighbor[1] who said he heard an "explosion" and called 911. (Trial Tr. 591: 9-15). This neighbor reported the home had been vacant for "quite some time". (Trial Tr. 591: 15-17). Chief Clapp called fire investigator Denis Bembenek to the scene to investigate further. (Trial Tr. 590: 20-25; 591: 1-5).

Denis Bembenek, an arson investigator with the Toledo Fire Department, also responded to 856 Nebraska. (Trial. Tr. 534: 6-8). Mr. Bembenek photographed the scene and canvassed the neighborhood, speaking with neighbors. (Trial Tr. 535: 3-14). Mr. Bembenek spoke with Otis Williams who again stated that the house was vacant, with people coming and going "occasionally". (Def. Ex. 52, at 23; Trial Tr. 535: 25; 536: 1-9).

The Court finds these witnesses are professional firefighters with many decades of experience, both in firefighting and fire investigations, between them. They are also neutral parties

---

1. This was later determined to be Otis Williams. *See* Def. Ex. 52, at 23, 34.

who *thoroughly* documented their observations on scene and in the hours following the blaze and accurately testified to such. For these reasons, the Court finds their testimony highly credible.

*Testimony of Neighbors and the Affidavits*

Plaintiff collected nine identical affidavits from his parents and various neighbors which all read:

> The undersigned Affiant, being duly sworn, deposes and states that:
>
> 1.   I currently, and at all relevant times, knew Gerald Riley.
>
> 2.   Since July 2016, Gerald Riley resided at 856 Nebraska Ave., Toledo, Ohio.
>
> 3.   Gerald Riley traveled for his work during the week but resided at 856 Nebraska.

*See* Def. Group Ex. 102. Four of these affidavits were not dated by their affiants, two are missing notary stamps, and three were notarized one month *before* they were signed. *See id.* Plaintiff did not present these affidavits as evidence at trial – Defendant did. Understandably so, because they are not facially credible.

One of the affiants, Otis Williams, had lived at 848 Nebraska Avenue for 37 years. (Trial Tr. 149: 20-25; 150: 1). He did not know Plaintiff well, but met Plaintiff when he first bought 856 Nebraska and Williams occasionally cut the grass there. (Trial Tr. 150: 16; 151: 4-12). He could not say exactly when Plaintiff bought the house, or when he moved in. (Trial Tr. 151: 17-21). He knew Plaintiff had tenants at one time, but could not recall when they moved out. (Trial Tr. 152: 13-14, 16-21). At trial, he testified that he thought Plaintiff lived there because he "sometimes" saw "him coming in and out of the house with girls". (Trial Tr. 154: 15-23). Mr. Williams did not remember signing an affidavit, but knew he signed "something". (Trial Tr. 158: 11-16). He did not read the document "all the way through". (Trial Tr. 159: 18-20). Mr. Williams knew Plaintiff's

profession as a truck driver, but denied knowledge of his work schedule – contrary to his affidavit. (Trial Tr. 160: 3-7). He knew "nothing" about Plaintiff's personal life. (Trial Tr. 160: 16-17). Mr. Williams expressed reluctance to Mr. Bembenek about participating in the investigation because "he didn't want someone coming by and burning his house up." (Trial Tr. 544: 23-25; 545: 1-2).

Comparing Mr. Williams' testimony in court to what he told Chief Clapp and Mr. Bembenek the evening of the fire, the stories vary wildly, from first telling fire personnel the home was vacant, to signing an affidavit asserting Plaintiff lived at the home, to finally testifying that he was not completely sure when Plaintiff lived at the home. Further, Mr. Williams's signature on his affidavit post-dates the notary's signature by one month. (Def. Group Ex. 102, at 7). For these reasons, the Court does not find Mr. Williams made a credible witness and his testimony does not assist the Court in establishing Plaintiff's residency status.

Dean Taylor, another affiant, lived one street over from 856 Nebraska and witnessed the fire. (Trial Tr. 466: 14-15, 24-25). He saw Plaintiff "come and go" from the home, but could not say when (or really *if*) he moved in. (Trial Tr. 469: 5; 474: 5-9). Mr. Taylor did not know Plaintiff's work schedule – contrary to what he asserted in the affidavit. (Trial Tr. 474: 10-12). He did not read the affidavit before he signed it and could not explain why his signature post-dated the notary's by one month. (Trial Tr. 479: 5-16). He attempted to distance himself from the contents of the affidavit, noting "I don't really try and be in everybody's business in the neighborhood[.]" (Trial Tr. 473: 25; 474: 1-2). For these reasons, the Court finds Mr. Taylor's affidavit and testimony not entirely credible.

A third affiant, William McCloud (Plaintiff's father), also testified at trial. He had been inside 856 Nebraska on a few occasions, helping Plaintiff remodel a bathroom and installing flooring and appliances. (Trial Tr. 274: 18-25). Mr. McCloud believed Plaintiff lived at 856

Nebraska because "he had his belongings there", but also noted that he "basically lived in the truck". (Trial Tr. 276: 16-18). He did not recall signing his affidavit in front of a notary and could not recall if the notary stamp was already on the document when he signed it. (Trial Tr. 288: 23-25; 289: 1-10). Mr. McCloud had a difficult time establishing dates or a time frame when Plaintiff moved into (or lived at) the home. He recalled various home-improvement projects where he assisted Plaintiff inside the home but, after numerous attempts on cross-examination, was unable to state exactly when they occurred, or if Plaintiff was residing there at the time. *See* Trial Tr. 290: 4-25; 291: 1-25; 292: 1-6; 296: 3-25. Due to Mr. McCloud's uncertainty, the Court does not find his testimony particularly helpful in establishing Plaintiff's residency status at the time of the loss.

Ariane Stevens did not produce an affidavit, but testified at trial. She was Plaintiff's former tenant at 856 Nebraska. (Trial Tr. 513: 2-10). On cross-examination, she estimated that she lived there from approximately November 2014 through July 2015. (Trial Tr. 522: 19-25; 523: 1-25; 524: 1-10). After moving out of Plaintiff's home, Ms. Stevens moved to another rental property directly across the street. (Trial Tr. 517: 17-21). At the time when she lived across the street, Ms. Stevens believed Plaintiff lived at 856 Nebraska because she saw him "coming and going". (Trial Tr. 520: 2-15). She saw Plaintiff replace the windows at his home. (Trial Tr. 520: 16-25; 521: 5-6). Ms. Stevens moved from that location approximately one year before the fire. (Trial Tr. 519: 1-9). At the time of the fire, she lived in another rental home two blocks from 856 Nebraska. (Trial Tr. 518: 17-25). Ms. Stevens did not offer any testimony to suggest she had any knowledge Plaintiff lived at 856 Nebraska at the time of the fire. For this reason, the Court does not find her testimony helpful in establishing his residency status at the time of the loss.

Plaintiff's mother, Ethel Mae Smith, did not testify at trial but was deposed in March 2018 and her deposition transcript was admitted into evidence. *See* Smith Depo; Trial Tr. 528: 18-25;

529 1-25. Ms. Smith had lived at 1554 Avondale in Toledo, Ohio for 34 years. (Smith Depo. 8: 7-10). She spoke with her son "just about every day". (Smith Depo. 11: 9-10). Ms. Smith could not recall Plaintiff's work schedule during 2016. (Smith Depo. 12: 13-20). She recalled Plaintiff living with her when he got out of prison, but could not remember when he moved out of her home to 856 Nebraska. (Smith Depo. 12: 21-24; 13: 1-24). When he moved out, Plaintiff took only clothing with him. (Smith Depo. 14: 11-17), and did not take any furniture (Smith Depo. 15: 4-7). Plaintiff only left a few pieces of clothing behind. (Smith Depo. 23: 1-9). Ms. Smith had been inside 856 Nebraska on two occasions, both while Plaintiff's tenant was still living there. (Smith. Depo. 15: 10-24; 16: 2). She did not know if he purchased new furniture, and had no knowledge of any improvements to the home other than a roof repair. (Smith Depo. 26: 3-17). She testified that Plaintiff lived at 856 Nebraska at the time of the fire, but offered no basis for this knowledge. (Smith Depo. 21: 3-6). Ms. Smith was unable to clearly answer many questions regarding where her son lived and when. *See generally* Smith Depo. This does not necessarily detract from her credibility, but the lack of certainty in her answers does not assist the Court in establishing Plaintiff's residency status at the time of the loss.

*Excavation Evidence*

Perhaps the most compelling residency evidence at trial came from the lack of personal property found during the excavation of 856 Nebraska. Convincingly, Mr. Bembenek said: "[n]ot everything burns up in a structure." (Trial Tr. 553: 11).

*David Row*

David Row was a senior fire investigator employed by Defendant, and assigned to investigate this case. (Trial Tr. 601: 6-9; 604: 5-6). Mr. Row went to 856 Nebraska twice, first on November 22, 2016, and a second time on December 1, 2016. (Trial Tr. 611: 14). He performed

an excavation of the rubble on December 1. (Trial Tr. 611: 15-16; 612: 9-10). He described the process as one where he hired an excavator, and the operator "[took] a scoop", and dropped it onto an open area of the yard where it could be spread out and sifted through. (Trial Tr. 612: 13-19). It took Mr. Row six hours to get through the entire pile of rubble. (Trial Tr. 612: 9-10).

During the excavation, Mr. Row located a range, refrigerator, washer, and dryer. (Trial Tr. 616: 15-21). He noted the gas range was heavily damaged, opining it was "exposed to heat for an extended period of time." (Trial Tr. 617: 1-5). Mr. Row also located and photographed the electrical distribution panel from the basement. (Trial Tr. 617: 18-21; Def. Ex. 57) (photos Bates stamped LM1741, LM1746). He pointed out that the main breaker switch was melted into the "off" position, indicating to him it was in that position at the time the fire affected it. (Trial Tr. 618: 3-6, 25; 619: 1-3). Mr. Row elaborated on the significance: "[t]he only way to have a breaker in the off position is to physically turn it to the off position. If it's shocked or there's heat, then it goes to the trip position." (Trial Tr. 623: 15-18). He also located the water heater which had a City of Toledo inspection sticker[2] on it. (Trial Tr. 624: 13-15; Def. Ex. 57) (photo Bates stamped LM1882). He testified that a valve in the gas supply line to the water heater was in the "off" position. (Trial Tr. 625: 3-25; 626: 1-3). A red valve attached to the water heater was also in the "off" position, indicating it had no water flowing to it. (Trial Tr. 626: 4-8; Def. Ex. 57) (photo Bates stamped LM1895). Finally, Mr. Row located the yellow gas line which ran from the gas supply to the furnace. (Trial Tr. 635: 8-12). It contained a red valve that was also in the "off" position, indicating the furnace was not being used. (Trial Tr. 635: 13-15; Def. Ex. 57) (photos Bates stamped 1866-67).

---

2. Mr. Bembenek provided Mr. Row with a copy of a City of Toledo water heater inspection report indicating this inspection took place on October 4, 1989. Trial Tr. 624: 17-22; Def. Ex. 57 (photo Bates stamped LM1936).

As noted above, Mr. Row described the personal property items he observed in the rubble: a range, refrigerator, washer and dryer, four metal dining room chairs, a portion of a table, some cloth drapes, one pair of men's athletic shoes, one black flip-flop, a futon mattress, springs from a loveseat, a printer, a VCR, and five television sets. (Trial Tr. 633: 4-16). He did not find any remnants of pots and pans, food items (either in cupboards or the refrigerator), or clothing (other than those few items listed above). (Trial Tr. 634: 4-12).

*Teresa Sultzbach*

Teresa Sultzbach is a personal property specialist employed by Defendant. (Trial Tr. 654: 8-9). She was tasked with managing Plaintiff's contents claim. (Trial Tr. 655: 12-25; 656: 2-3). Ms. Sultzbach was also present during the excavation. (Trial Tr. 661: 14-15). She observed the same household items removed from the rubble as Mr. Row did, listed above. (Trial Tr. 664: 8-24). And, like Mr. Bembenek, she emphasized (based on her prior experience) that when a house burns, many of the contents are still visible and able to be identified. (Trial Tr. 677: 24-25; 678: 1-13). The twenty or so items located during the excavation are a far cry from the 3,582 items Plaintiff claimed were inside the home and destroyed during the fire – quite a few of which were *metal*. *See* Def. Ex. 26.

The evidence shows the excavation at 856 Nebraska was done thoroughly and professionally. Mr. Row and Ms. Sultzbach took over 286 photographs documenting the excavation process and the evidence they uncovered. *See* Def. Ex. 57. Though they were employed by Defendant, the Court still finds their photographs persuasive, and their recorded observations and testimony credible.

*Utility Usage*

Contrary to Defendant's position, the Court finds the evidence demonstrating Plaintiff's utility usage from May 2016 (when he allegedly moved in) through October 2016 does not assist in establishing his residency status *at the time of the loss*. Plaintiff emphasizes this, and additionally relies on the fact that utilities to the property (gas, electricity, and water) were all "turned on" and "in use" in November 2016. (Doc. 112, at 15). However, as the facts below show, Plaintiff's utility use was at a *bare minimum* across the board around the time of the loss. Further, though Plaintiff's utility usage in the months prior to the loss does not assist the Court in establishing his residency status at the time of the fire, Plaintiff's misrepresentations about his utility usage during this time period speak directly to his credibility and ultimately contribute to the voidability of the policy under the Concealment or Fraud clause, to be addressed in more detail below. *See* Pl. Ex. 1, at 19.

*Electricity*

Toledo Edison employee Uhuru Freeman gave deposition testimony in November 2018. *See* Def. Group Ex. 109 ("Freeman Depo."). She testified to Toledo Edison's record keeping as well as to Plaintiff's connection and usage history. *See id*. Plaintiff himself admitted that he had no electricity service to 856 Nebraska from May 2015 through July 2016. (Trial Tr. 300: 18-25). From his connection date of July 12, 2016 through August 1, 2016, Plaintiff was billed $4.07 for his consumption. (Def. Group Ex. 109, at 20). Ms. Freeman testified that "usually if there's absolutely no consumption, a customer would get charged around $4." (Freeman Depo. 77: 25; 78: 1-2). Plaintiff's electricity consumption during the month of August 2016 was not much higher – $14.12 worth. (Def. Group Ex. 109, at 22). His consumption from September 2016 through the the end of October resulted in similar charges. (Def. Group Ex. 109, at 24-28) (statements reflecting Plaintiff's usage: September 2016 – $19.15; October 2016 – $10.26). Plaintiff's

November 2016 statement was not included in Exhibit 109, but a January 2017 bill reflects a charge of $5.80. (Def. Group Ex. 109, at 28).

Plaintiff stated he moved into 856 Nebraska in May 2016. (Def. Ex. 106, 32: 17-21). Between May and July, when he had no electricity service to the home, Plaintiff testified that he used a gasoline powered generator. (Trial Tr. 308: 7-9). Interestingly, he stated he kept this gas-powered machine running *in the basement* of his home. (Trial Tr. 308: 10-13). He described a basement that had block windows with small vents in the center. (Trial Tr. 309: 22-15; 310: 1). Indeed, photographs of the fire scene, taken by Mr. Bembenek while the home was still ablaze, show glass-block windows at the basement of 856 Nebraska Avenue. *See* Def. Ex. 56 (five color photographs of the gas meter with basement windows in the background). However, the photographs also reveal that the windows were, in fact – ventless. *See id.* Therefore, if Plaintiff's generator tale were true, he would have presumably been unavailable to testify at trial because he would have died of carbon monoxide poisoning in May 2016 while powering his home with a gas-powered generator in his unventilated basement.

*Water*

Darlene McClure, a billing supervisor with the Toledo Department of Public Utilities, was deposed in October 2018. *See* Def. Group Ex. 110, 6: 5-6 ("McClure Depo."). She testified Plaintiff had no water service to 856 Nebraska from February 2016 through August 2016. (McClure Depo. 22: 17-24; 23: 1-16). Notably, from October 2016 through December 2016, Plaintiff used only three centum cubic feet ("CCF") of water. (Def. Group Ex. 110, at 25). For context, Ms. McClure noted that one CCF is equal to approximately seven gallons of water.

(McClure Depo. 15: 2-10). In other words, from October 1, 2016 through the date of the fire, November 18, 2016, Plaintiff used approximately 21 gallons of water.

At trial, Plaintiff told the Court that he had no water service when he moved to 856 Nebraska in May. (Trial Tr. 303: 6-8). He went approximately two to four weeks without water before "a guy" illegally turned it on for him in late May or early June 2016. (Trial Tr. 303: 2-3, 8-15). During this time, Plaintiff urinated in his yard and showered and defecated at his mother's home. (Trial Tr. 303: 18-24; 304: 11-12, 23). He drank bottled water and did not cook. (Trial Tr. 307: 3-15). The evidence shows Plaintiff did not call to have his water service connected until August 31, 2016, s*ee* Def. Group Ex. 111, Ex. C3 (audio recording of the call), and his usage beyond that was minimal.

### Natural Gas

Columbia Gas employee Patricia Beas gave deposition testimony in October 2018. (Def. Group Ex. 108) ("Beas Depo."). She had been employed by Columbia Gas for 27 years, and at the time was a billing specialist. (Beas Depo. 7: 9-17). Notably, she testified there was zero gas consumption at 856 Nebraska from August 25, 2015 to September 6, 2016. (Beas Depo. 37: 14-24). The meter readings on these two dates were identical. *See* Def. Group Ex. 108, Ex. E, at 14, 23. Plaintiff called to request gas service connection on August 31, 2016[3] (Beas Depo. 38: 16-24; 39: 1-2; Def. Group Ex. 108, Ex. E, at 14 (reflecting this transaction)). There was virtually no gas

---

3. Columbia Gas employees connected service to 856 Nebraska on September 6, 2016. (Beas Depo. 38: 16-22).

usage from that date until November 18, 2016 (the date of the fire). *See* Def. Group Ex. 108, Ex. E, at 19 (usage summary reflecting Plaintiff used two CCF of natural gas during this entire period).

Plaintiff testified he had "free gas" at 856 Nebraska from May 2016 through September 2016. (Trial Tr. 322: 4-13). However, Columbia Gas personnel revealed they received a disconnection request in June 2015. (Def. Group Ex. 108, Ex. F1). Columbia Gas temporarily held the gas service in the company's name, consistent with its procedures, in anticipation that a new customer would call to connect the account. *See* Beas Depo. 34: 21-24; 35: 1-17. The account was disconnected out of its name in August 2015. (Beas Depo. 35: 22-24; 36: 1-2). And, as noted above, the meter did not change from August 2015 to September 2016, when Plaintiff had his gas service reconnected. The evidence here clearly shows Plaintiff did not receive any "free gas" prior to September 2016 and that he had virtually no meaningful usage beyond that.

*Plaintiff's Testimony*

In addition to the abovementioned misrepresentations about his utilities, Plaintiff made blatant misrepresentations about everything from the purchase of his home, his residency status, the contents within the home, and improvements he made to it. Plaintiff's stories changed at every turn during the investigation of his claim, and some ultimately changed again at trial while he was under oath. The Court addresses these inconsistencies below, and ultimately finds Plaintiff's testimony devoid of any credibility.

*Purchase of, and Improvements to, the Home*

Within his insurance application dated July 22, 2016, Plaintiff stated that he purchased 856 Nebraska for $250,700 in 2015. (Def. Ex. 22, at 1). At trial, Plaintiff stated he purchased the home

for $6,000. (Trial Tr. 330: 22-23). However, the Lucas County Auditor's records revealed Plaintiff purchased the home May 21, 2014 from Tyrone Riley for $1,500. *See* Def. Ex. 62, at 1.

Also within his insurance application, Plaintiff represented his roof was "0" years old and in "good" condition. (Def. Ex. 22, at 1). At his February 2017 examination under oath ("EUO"), Plaintiff testified his brother put a new roof on the home "in June or July" of 2016. (Def. Ex. 106, 46: 11-16). When asked for his brother's contact information, Plaintiff did not know his address (including the street he lived on) and claimed he did not own a cell phone. (Def. Ex. 106, 46: 23-24; 47: 1-7). At his deposition on March 5, 2018, Plaintiff stated his brother replaced "half" of the roof. (Def. Ex. 107, 30: 3-10) ("Plaintiff Depo."). At trial, Plaintiff spun a different tale, testifying that his brother replaced "just a section" of the roof at the back of the house in April 2016. (Trial Tr. 196: 4-14, 21-22).

At another point in his insurance application, Plaintiff stated his electrical system, HVAC, and plumbing were each updated in 2015. (Def. Ex. 22, at 1). At his EUO, Plaintiff testified that he put in a "new" water heater in 2014 that he purchased "at Home Depot or Lowe's". (Def. Ex. 106, 50: 18-24; 51: 1-3). At trial, Plaintiff stated the water heater was used, purchased from "a guy" named "Billy". (Trial Tr. 262: 19-25; 260: 1-25). He further testified at his EUO that he installed a "new" furnace in 2014. (Def. Ex. 106, 52: 1-24; 53: 11-14). At trial, Plaintiff backtracked again, stating he bought a "used" furnace from "Billy". (Trial Tr. 260: 1-25). Finally, at trial, Plaintiff testified he never updated the plumbing (Trial Tr. 328: 8-9), and only replaced part of the home's duct work in 2014 (Trial Tr. 327: 15-19; 326: 5-7).

Plaintiff also gave several conflicting statements regarding kitchen renovations. At deposition, Plaintiff stated he remodeled the kitchen in 2014, shortly after purchasing the home. (Plaintiff Depo. 21: 12-20). Plaintiff told adjuster Andrew Wozniewski that he purchased new

cabinets from Home Depot and new countertops from Lowe's during a 2016 kitchen renovation. (Trial Tr. 705: 16-25). At trial, Plaintiff testified he purchased used cabinets from a "rehab place". (Trial Tr. 267: 9-19). At deposition, Plaintiff stated that he had used kitchen appliances in the home while his tenant lived there, but purchased all new appliances when he moved in. (Plaintiff Depo. 22: 1-2). However, later in his deposition, Plaintiff stated he had "some new" appliances and "some from estate sale". (Plaintiff Depo. 74: 14-16). He purchased the "new" appliances from Best Buy. (Plaintiff Depo. 74: 17-18), but could not recall which appliances were new or which were used, other than that the refrigerator was used (Plaintiff Depo. 75: 1-7).

*Personal Property*

In December 2016, Plaintiff represented to Defendant that he lost 3,582 personal property items in the fire. *See* Def. 26. However, after a six-hour excavation, less than 30 identifiable items were pulled from the rubble. *See* Trial Tr. 633: 4-16. This is particularly telling, considering the entire structure at 856 Nebraska did not burn and the garage was completely unaffected. *See* Def. Ex. 56 (color photographs from the fire scene on November 18, 2016).

By way of example, Plaintiff's detached garage was completely unaffected by the fire. (Trial Tr. 613: 2-3) (Mr. Row's testimony the garage had "no fire damage on it at all."); *see also* Def. Ex. 56 (Mr. Bembenek's on-scene photographs). In his contents inventory, Plaintiff claimed he had 129 items stored in the garage including various hand-tools, electric tools, and lawn equipment. *See* Def. Ex. 26 (documents labeled "Ohio Fire Claims 087" through "Ohio Fire Claims 094"). On excavation, investigators were able to locate the remains of the unburnt garage in the rubble. (Trial Tr. 613: 1-11). Yet, the only items located inside were a few truck parts and a pick-up truck cap. *Id.*

Plaintiff also had trouble consistently identifying the age and condition of his personal property. For example, at his EUO, Plaintiff stated his washer and dryer were approximately six months to a year old and he bought them "new" from Best Buy. (Def. Ex. 106, 62: 9-14; 83: 22-24; 84: 1-6). At deposition, he stated they were two years old and he bought them from an estate sale. (Plaintiff Depo. 72: 10-16; 73: 5-13). At trial, he stated the same. (Trial Tr. 177: 4-6).

When asked for a date of purchase for his items, Plaintiff represented that nearly a third of the listed items were purchased before his May 2016 move-in date. *See* Def. 26. Notably, at deposition, Plaintiff stated he had no furniture or personal property *anywhere* in storage prior to the fire. (Plaintiff Depo. 63: 21-24; 64: 1-3). His mother testified that, when Plaintiff moved out, "he didn't have to take anything from my house because that was my furniture." (Smith Depo. 14: 8-9). She noted Plaintiff took only personal items, such as clothing, with him because "that's all Gerald really had". (Smith Depo. 14: 14). At his EUO, Plaintiff testified he left "a little bit" of clothing at his mother's home after he moved out, and "that's about it." (Def. Ex. 106, 81: 15-24). He expressly denied having any other personal effects there including furniture. (Def. Ex. 106, 82: 14-17). Plaintiff's mother confirmed he only left a few pieces of clothing behind when he moved out. (Smith Depo. 23: 1-9). Yet at trial, when confronted about the inconsistencies in his property list, Plaintiff testified he kept several pieces of furniture and other items – purchases that pre-dated his move to 856 Nebraska – inside his mother's garage for storage prior to his move. (Trial Tr. 354: 15-25; 356: 1-12; 173: 22-24). When comparing the purchase dates in Plaintiff's inventory to the statements made under oath and at trial, one of two possibilities exist: (1) Plaintiff (and his mother for that matter) lied under oath during deposition when they represented that Plaintiff had no property other than clothing stored at his mother's home or elsewhere prior to the fire; or (2) these items did not exist and Plaintiff fabricated a substantial portion of his contents inventory.

Either way the result is the same – Plaintiff lied. When comparing Plaintiff's statements and his contents inventory to the excavation evidence detailed above, the latter is the more likely scenario. These misrepresentations detract from Plaintiff's credibility, support Defendant's position that Plaintiff did not reside at 856 Nebraska at the time of the loss, and violate the terms of the "concealment or fraud" clause under the insurance contract, as discussed in detail below.

For the foregoing reasons, the Court finds Plaintiff failed to meet his burden of demonstrating that he complied with the residency terms of his policy. The evidence of Plaintiff's residency status weighs very strongly in Defendant's favor. Plaintiff attempts to poke holes in Defendant's residency evidence by noting it "did not put on a single witness who stated Mr. Riley lived elsewhere." (Doc. 112, at 15). As noted above, they did not have to – the burden here rests entirely on Plaintiff's shoulders. *State Farm Fire & Cas. Co.*, 720 F. Supp. at 1314 ("Under Ohio law, the burden is on the insured to prove that he is entitled to coverage by showing facts sufficient to establish that his loss was within the description of the policy."). Therefore, Defendant justifiably denied coverage based on the terms of the policy which required Plaintiff to reside at the property.

<u>Coverage Status and Plaintiff's Misrepresentations</u>

In addition to Plaintiff's non-compliance with the residency terms of the insurance contract, Defendant denied coverage on the fire claim based upon "material misrepresentations" made by Plaintiff, both in his insurance application and during the investigation into his claim. (Doc. 113, at 23-24). Plaintiff claims the "material misrepresentation" defense fails because the policy did not satisfy either requirement under *Allstate Ins. Co. v. Boggs*, 271 N.E.2d 855, 858 (Ohio 1971). (Doc. 112, at 17-20). For the following reasons, the Court finds Plaintiff voided coverage on the

insurance contract when he made material misrepresentations on his application and during the investigation of his fire claim, in violation of the "concealment or fraud" clause in the contract.

There are essentially two ways a defendant insurer can void coverage based upon an insured's misstatements. The first involves misstatements made during the application process. Under Ohio law, if an insured makes a material misstatement in an insurance application, such misstatement will render policy void *ab initio* if the statement constitutes a warranty, as opposed to a misrepresentation. *Boggs*, 271 N.E.2d at 858. To create a warranty, the misstatement must: (1) appear "on the face of the policy or in another instrument specifically incorporated in the policy", such as an application; and (2) the policy must "clearly and unambiguously" warn the insured that a misstatement renders the policy void *ab initio*. *Id*. Policy language is "construed strictly against the insurer, and liberally in favor of the insured." *Id*. (citing *Butche v. Ohio Cas. Ins. Co*., 187 N.E.2d 20 (Ohio 1962)). The second, comes into play when an insured violates a "concealment or fraud clause". Under a concealment or fraud clause, an insurer may void a contract if it finds the insured made a material misrepresentation during the insurer's investigation into his or her claim. *McCurdy v. Hanover Fire & Cas. Ins. Co*., 2013 WL 4050909, at *3 (N.D. Ohio). Such clauses are fully enforceable under Ohio law. *Taylor v. State Farm Fire & Cas. Co*., 2012 WL 1643877, at *3 (N.D. Ohio) (citing *Smith v. Allstate Indem. Co.*, 304 F. App'x 430, 431-32 (6th Cir. 2008)).

In a letter to Plaintiff dated May 18, 2017, Defendant officially denied coverage on the fire claim at 856 Nebraska. *See* Pl. Ex. 2. The letter stated, in part:

> After a full investigation and thorough review of the circumstances surrounding this matter, Liberty Insurance Corporation has determined that no further coverage will be afforded for this loss and your claim is denied.

> This decision is based on information gathered throughout the course of our investigation into your claim. The results of our investigation revealed that you did not reside at 856 Nebraska Ave, Toledo, OH at the time you applied for your homeowner's policy or at the time of the reported loss, contrary to your representations. Based upon this, no coverage will be afforded for the loss and we respectfully deny your claim.
>
> Additionally our investigation determined items claimed on the proof of loss submitted contained inaccurate information and is rejected.

(Pl. Ex. 2, at 1). The letter then provides quotes from Plaintiff's contract, including the residency provision and the "concealment or fraud" clause. *Id.* at 2. As outlined here, Defendant denied the claim due to Plaintiff's misrepresentations, both at the time of his application and during the investigation into his claim.

*Void ab Initio*

Plaintiff argues his policy was not void *ab initio* because Defendant did not satisfy either warranty requirement under *Boggs*. (Doc. 112, at 18). He argues that no misstatement appears on the face of the policy, and further, the policy does not incorporate the insurance application. *Id.* The Court disagrees and finds both *Boggs* requirements satisfied. However, the Court finds the contract not void *ab initio* because Defendant failed to comply with a separate self-imposed condition.

The first *Boggs* prong requires that an insured's misstatement appear "on the face of the policy or in another instrument specifically incorporated in the policy" (such as an application). *Boggs*, 271 N.E.2d at 858. The instrument here – Plaintiff's July 2016 insurance application (Def. Ex. 22) – was *expressly* incorporated into the policy, *see* Pl. Ex 1, at 25. Within his application, Plaintiff represented his mailing address as 856 Nebraska Avenue, that his roof was brand new, that he paid $250,700 for his home, and that he updated his plumbing and HVAC in 2015 – all of

which proved to be untrue, thereby satisfying the first prong. *Id*. The second demands the policy "clearly and unambiguously" warn the insured that a misstatement renders the policy *ab initio*. *Boggs*, 271 N.E.2d at 858. For the second requirement, one need only look to the plain language within the policy:

AGREEMENT

> [***] The application for this policy is incorporated herein and made a part of this policy. When we refer to the policy, we mean this document, the application, the Declarations page, and any applicable endorsements. *The Insured agrees that all of the statements in the application for this policy are his or her statements, and constitute warranties*. The Insured agrees that this policy is issued in reliance upon the truth of the Insured's warranties in the application. *If it is determined that any warranty made in the application is incorrect, this policy shall be void ab initio (void back to the date of inception) upon return of the policy premium*.

(Pl. Ex. 1, at 25) (emphasis added). The language here could not be any clearer – the policy clearly (and unambiguously) warns the insured that a misstatement in his or her application renders the policy void *ab initio*. *Id*. However, in reviewing the same language, an additional requirement is made clear – the policy is only void *ab initio* "*upon return of the policy premium*". *Id*. (emphasis added). Here, as Plaintiff points out, Defendant never returned his premium. (Doc. 112, at 19). Construing this language liberally in the insured's favor, the Court finds Defendant did not comply with its own condition and thus, the policy was not void *ab initio*.

*Concealment or Fraud Clause*

Though the policy was not void from the outset through Plaintiff's misrepresentations, the Court finds Plaintiff's misrepresentations trigger the "concealment or fraud" clause within his insurance contract, thereby voiding coverage.

Plaintiff's insurance contract contains a concealment or fraud clause. It states, in part:

> 2.   Concealment or Fraud. The entire policy will be void if, whether before or after a loss, an "insured" has:
>> a.   Intentionally concealed or misrepresented any material fact or circumstance;
>> b.   Engaged in fraudulent conduct; or
>> c.   Made false statements;
>> relating to this insurance.

(Pl. Ex. 1, at 19). A plain reading of this clause reveals that an insured will void his policy if – before or after a loss – he "[i]ntentionally conceal[s] or misrepresent[s] *any* material fact or circumstance". *Id.* (emphasis added). The insured may not also engage in fraudulent conduct or make any false statements relating to his insurance. *Id.* As thoroughly discussed above, Plaintiff made several material misrepresentations about everything from his residency status, his utilities, to the amount of personal property he lost in the fire, and the age of personal property. Plaintiff also lied on his insurance application, which did not render the policy void *ab initio*, but does void the policy under the concealment or fraud clause because he made these material misrepresentations *before* the loss. *See* Def. Ex. 22.

Upon a review of the totality of the facts in evidence, the Court reaches one inescapable conclusion – Plaintiff got caught lying, and Defendant properly elected to void coverage under the "concealment or fraud" clause.

In summary, the Court finds Plaintiff did not reside at 856 Nebraska at the time of of the fire loss as required under the insurance contract. Further, the Court finds Plaintiff triggered the terms of the "concealment or fraud" exclusion under the contract. Therefore, Defendant rightly denied coverage on both grounds, though it only needed one.

## CONCLUSION

Following review, and for the reasons contained herein, the undersigned grants judgment in favor of Defendant and dismisses the case with prejudice.

**IT IS SO ORDERED.**

 s/ James R. Knepp II
United States Magistrate Judge